Eugene Oliver **BUTLER** and James G. Scribner, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 17417.

United States Court of Appeals Ninth Circuit.

Nov. 15, 1962.

Hiram W. Kwan, Los Angeles, Cal., for appellants.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Section, Edward M. Medvene, Asst. U. S. Atty., and Jo Ann Dunne, Los Angeles, Cal., for appellee.

Before POPE, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is an appeal by two defendants from judgments of conviction of violations of Title 18 United States Code § 152 after a trial by jury. Jurisdiction below rested on 18 U.S.C. § 3231 and here on appeal on 28 U.S.C. § 1291.

Count I charged defendant Butler with knowingly and fraudulently transferring over $8,000 in value of property of a corporation, the San Fernando Valley Wholesale Food Distributors, Inc., in contemplation of bankruptcy. Count II charged the same defendant with knowingly and fraudulently concealing the same $8,000 from the receiver in bankruptcy. Count III charged the same defendant with making a false account of the same sum in bankruptcy proceedings.

Count IV charged defendant Scribner with knowingly and fraudulently transferring property of a corporation worth $6,200 in contemplation of bankruptcy.

Count V charge Scribner with knowingly and falsely concealing $6,700 in the same bankruptcy.

Count III was dismissed by the government on trial. Each defendant was convicted on each of the remaining two counts, and each sentenced to four years on each count, to run concurrently.

A motion to reduce sentence was filed on behalf of each defendant, and denied. Motions for new trial were made on behalf of each defendant, and denied.

Section 152 of Title 18, United States Code, provides in pertinent part:

"Whoever knowingly and fraudulently conceals from the receiver * * * or from creditors in any bankruptcy proceeding, any property belonging to the estate of a bankrupt; or

"Whoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding; or

"Whoever, either individually or as an agent or officer of any person or corporation, in contemplation of a bankruptcy proceeding by or against him or any other person or corporation, or with intent to defeat the bankruptcy law, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; * * *

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Appellants raise three points on this appeal:

1. The insufficiency of the evidence.
2. Defendants did not receive a fair trial, because:
   (a) the trial was hurried;
   (b) the defendants were not adequately represented.
3. Newly discovered evidence (*i. e.*, error in not granting a new trial on that ground).

These specific points raised become mingled, prolix and obtuse when stated

in appellants' brief.[1] There is then added an additional point:

4. Improper receipt of evidence.[2] (Point three in the Opening Brief.) [3]

Points I and III in appellants' brief refer to the "rushed nature of" and the "unduly hurried" trial. This charge requires a careful study of the complete transcript of evidence, as well as a study of the Clerk's Transcript.

Trial began on April 25, 1961, at 9:30 A.M., and the jury was impaneled in the forenoon. The government's case was presented from 2:05 P.M. to 5:50 P.M. on the 26th, with two recesses totaling forty minutes. The second day's session started at 9:30 A.M. on April 26, 1961, and ran to 12:15 P.M. with a thirty-five minute recess. It reconvened at 1:40 P.M., and ran until 6:05 P.M., with an hour's total recess, at which time the government rested. From 6:05 P.M. to 6:45 P.M. counsel argued without the jury's presence, and the court then adjourned. On April 27th, 1961, defendants put in their case, running from 9:45 A.M. to 12:30 P.M., with two recesses, one of thirty minutes and one of twenty-five. At 1:50 P.M. court reconvened, and ran until 5:30 P.M. with two recesses of fifteen and twenty minutes, respectively. The jury was then taken to dinner at government expense, and thereafter sat from 7:45 P.M. to 8:45 P.M., and from 9:15 to 9:50 P.M., and were then excused until 1:00 P.M. on April 28, 1961.

On that date, court reconvened at 2:00 P.M., and the jury heard arguments until 5:25 P.M. with a twenty-minute recess. A recess was then taken over the weekend.

On May 1st, 1961, at 9:08 A.M. the jury was instructed, and returned its verdict at 11:30 A.M.

During the government's case, some one hundred and thirty or one hundred and forty exhibits were introduced, though some, such as 1–A to 1–R, were multiple-paged exhibits; many were checks and receipts for payments (three were later stricken). Thirty-nine exhibits were offered by defendants. Many were identified by one witness and introduced in groups (Tr. pp. 77, 108).

At no time during the trial did counsel for defendants complain that he was being unduly hurried, either by the court or the prosecutor.

There is no question but that the trial judge "kept the pressure on" counsel for

---

1. "I
"THE EVIDENCE SUBMITTED BY THE GOVERNMENT WHEN EXAMINED ALONE OR IN CONTEXT, TO WIT, THE COMPLEX OF CORPORATION INTEGRATED INTO THE FREEZER AND FOOD PLAN VENTURE, IS INSUFFICIENT TO SUSTAIN THE VERDICT OF CONVICTION, BUT THIS PERSPECTIVE WAS BECLOUDED BY THE SUBMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE WHICH WAS PRESENTED TO THE JURY IN AN UNDULY HURRIED FASHION, TO WIT, CROWDING THE TRIAL INTO THREE DAYS WITH NIGHT SESSIONS.

"II
"THE TRIAL COURT ERRED IN DENYING A NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE, SINCE AFFIDAVITS WERE SUBMITTED TO THE EFFECT THAT THE TESTIMONIES OF THE GOVERNMENT'S PRINCIPAL WITNESSES WERE FALSE, PERJURIOUS AND MISLEADING, AND AN EXAMINATION OF THESE TESTIMONIES INDICATED THAT THEY WERE INFLAMMATORY, MATERIALLY PREJUDICIAL AND FURTHERMORE, CONSTITUTED THE ONLY SUBSTANTIAL EVIDENCE SUBMITTED BY THE GOVERNMENT ON THE ISSUE OF INTENT."

2. "III
"DUE TO THE CLOSENESS OF THE QUESTION BEFORE THE COURT, APPELLANTS WERE PREJUDICED AND DEPRIVED OF A FAIR TRIAL BY THE RECEIPT OF IRRELEVANT AND IMMATERIAL EVIDENCE WHICH BECLOUDED THE ISSUES TO THE CONFUSION OF THE JURY AND THIS CONFUSION WAS FURTHER COMPOUNDED BY THE RUSHED NATURE OF THE TRIAL."

3. Appellants have wholly failed to comply with Rule 18(d) of the Rules of this Court.

both sides to speed the trial procedures. It is unusual, but not unheard of, for District Courts of the United States to run night sessions. The trial was hurried, but no judge of any experience has not hurried trials, and urged haste on trial counsel, upon occasions.

On the other side of the ledger, the court carefully aided the jury by "on the spot" explanations of the significance of evidence that was being introduced, or rulings he had made.[4] It is true that the court exhibited some impatience,[5] but this was impartially demonstrated.[6] The court endeavored to effect some efficiency,[7] and exhibited considerable courtesy,[8] and was generally most helpful.[9]

The court, while urging haste, repeatedly told defendants they could have "all the time you need." (Tr. p. 457, l. 9; p. 341, l. 13; p. 617, l. 19; p. 647, l. 13 to p. 648, l. 19.) "I don't want you to feel you are pressed. I want you to take all the time you feel is necessary." (Tr. p. 366, ll. 9–14; p. 512, ll. 3 and 4; p. 583, ll. 23–25.) The court at 6:10 P.M. on April 26th, 1961, had time to listen to counsel for defendants' legal anecdote (Tr. p. 371, ll. 4–19). Counsel for the government asked the court for thirty to forty minutes for argument. Counsel for defendants asked for an hour. The court allowed each side one and one-half hours (Tr. p. 648).

This case grows out of the bankruptcy on Setember 12, 1959, of San Fernando Valley Wholesale Food Distributors, Inc., a corporation (herein sometimes referred to as "San Fernando"). As a franchised dealer of Orange County Wholesale Distributors, Inc., a corporation, (herein sometimes referred to as "Orange") it sold freezers delivered by Orange upon at the same time it sold contracts to purchase certain food to be stored in such freezers. Such food was purchased wholesale, and sold without mark up. Both purchases were by long-term contracts, and such contracts were discounted to various loan companies. The freezers were sold at a profit and the food at cost. Membership accounts were also sold to the public, authorizing the purchase of food at favorable prices. The freezer contracts were more readily refinanced than the food contracts. The latter, with the membership contracts, were sometimes refinanced at discounts up to thirty-five percent of principal.

■ From our careful consideration of the entire record, we are convinced the trial court acted fairly, impartially and carefully, though expeditiously, during the trial. He did not unduly rush or unduly hurry the trial. No right was taken from either defendant. Undue delay in the trial of cases during the trial itself is as much a problem in the administration of justice as is delay in reaching a trial date. The former produces the latter. Each judge has his own pace, and his own method, of trying a case. There exists in this record not the slightest evidence of any abuse of the trial court's wide discretion in the matter.

Having eliminated the "aura" claimed to have existed around the alleged insufficiency of the evidence, we meet directly that claim of "insufficiency of the evidence * * * when examined alone." We have read the entire transcript of

---

4. See Transcript, pp. 12–15; p. 24; p. 100; p. 144; p. 293, l. 4 to p. 294, l. 16; p. 513, ll. 5–22.

5. Transcript, pp. 29, ll. 8–12; p. 40, ll. 6–16; p. 78, l. 13 to p. 81, l. 25; p. 400, l. 19 to p. 401, l. 2.

6. Transcript, p. 157, l. 15 to p. 158, l. 4; p. 159, ll. 5–18; p. 286, l. 22 to p. 287, l. 7; p. 76, ll. 6–17; p. 341, ll. 12–19; p. 515, ll. 11–16; p. 632, l. 13 to p. 633, l. 3.

7. Transcript, p. 38, ll. 15–22; p. 236, l. 14 to p. 237, l. 5; p. 282, ll. 8–14; p. 341,

ll. 20–24; p. 365, ll. 13–24; p. 585, ll. 13–22.

8. Transcript, p. 76, ll. 6–17; p. 97, ll. 11–25; p. 120, ll. 9–21; p. 146, ll. 6·11; p. 265, l. 24 to p. 266, l. 9; p. 277, ll. 11–24; p. 286, ll. 2–21; p. 314, l. 16 to p. 315, l. 14; p. 430, ll. 11–20.

9. Transcript, p. 207, l. 14 to p. 208, l. 12; p. 209, ll. 1–11; p. 232, l. 13 to p. 233, l. 20; p. 282, l. 22 to p. 283, l. 11; p. 511, ll. 22–23.

evidence. We find no basis for such a claim. There was evidence that defendants did receive moneys, both prior to and after the date of the voluntary petition which was owned by the corporation which they controlled and which became a bankrupt. There was testimony from F.B.I. Agent Earl that each defendant had admitted to him that they each received $4,800 from a second corporation (Preferred) on September 4, 1959, *after* the decision to file the petition in bankruptcy for San Fernando had been made. Meanwhile moneys due San Fernando had been placed during July and August 1959 (within sixty days prior to the bankrupty of September 11, 1959) in Preferred Enterprises, Inc., a corporation organized by the defendants and/or their wives in late June 1959.

Appellants attempted to justify these and several other transactions in which they received moneys (such as the sale of two of the corporation's automobiles) by explaining (a) they had used the funds to pay certain bills of the bankrupt corporation (including salaries) in cash; (b) that some of the freezers sold for which the corporation was to receive payments were returned by the purchasers, because defective, and hence that San Fernando was entitled to credit from Orange; (c) that the records of what freezers had been delivered were not accurate; (d) that the corporation had expanded too rapidly (enlarged quarters, etc.); (e) that they were entitled to the funds as a bonus voted by the corporation the previous year, but unpaid previously. There were résumés prepared by government investigators showing the amounts received by the defendants. The defendants gave explanations as to what they did with *part* of such moneys. As to some small sums, defendants did not "have the slightest idea" what had happened to the money (Tr. pp. 603, 617, 623).[10]

Scribner was not a very convincing witness on his own behalf when asked specific questions as to where the proceeds of checks payable to him had gone, he did not "believe" he had used the money himself (Tr. p. 626); he did not know if his father had been paid off on a loan made to a second subsidiary corporation (Tr. p. 634); he did not remember if he had made *any* initial investment in the bankrupt corporation (Tr. p. 637); he did not know if his income tax showed any "bonus" income (Tr. 639). Butler's explanation of his alleged bonus was unconvincing. The government showed defendants had spent for personal living large sums of money compared to the money that they had earned (Tr. p. 627; 534–535); that Scribner's alleged "bonus" had never been reported as income by him at any time; that he failed to explain why certain checks for moneys due San Fernando, totaling over $9,000, he requested be made out to him personally and sent to his home, on August 27, 1959, two weeks before the voluntary bankruptcy.

But we need not pass upon the credibility of the defendants, for the jury has already done so. As counsel states in appellants' brief: "The question presented to the jury * * * was * * * appellants' intent to knowingly and fraudulently conceal assets of the

10. "A. Exhibit No. 96 is a check from Orange County Wholesale Food Distributors, dated September 14, 1959, made payable to San Fernando Food Distributors in the amount of $462.80.

"Q. Now, sir, this was dated what date?

"A. September 14th, sir.

"Q. And who is it endorsed by, Mr. Scribner?

"A. It is endorsed by San Fernando Valley Locker Service, and under that my signature, Jim Scribner.

"Q. All right. What disposition was made of this money, sir?

"A. Mr. Sherman, I honestly wouldn't know offhand. I would assume that it would have been handled, probably, in the same manner that the Thunderbird transaction was. Or it could have been left in the account for the locker plant bill. I honestly couldn't tell you.

"Q. Now, sir, did you receive any of these funds personally, if you recall?

"A. Mr. Sherman, I don't recall. I could have. I truthfully don't remember." (Tr. pp. 605–606.)

bankrupt in contemplation of bankruptcy * * * ", and thereafter.[11] The jury by its verdict concluded appellants had done so. We are bound by their verdict, there being substantial evidence to support it. We must consider the evidence and the inferences to be drawn therefrom most favorable to the government. We do not, and cannot, apply "trial court" standards of weighing the evidence. Glasser v. United States, 1941, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Sandez v. United States, 9 Cir., 1956, 239 F.2d 239.

■ As to the error alleged in not granting a new trial,[12] a careful examination of the affidavits supporting that motion indicates they contain nothing not known to defendants prior to the trial; they are strictly cumulative,[13] and there is no showing as to why the evidence alleged to be material was not produced at the trial. At best, they indicate that the officers of Orange County Food

Distributors, the principal creditor of the bankrupt, were determined to put the debtor into bankruptcy if its debts were not paid to the creditor. This is no crime.

We have repeatedly stated what must be established by a litigant before any right to a new trial exists.[14] The proof here fails completely to require the court below, or this court, to take any action.

■ As to the alleged receipt of irrelevant evidence, appellants, without compliance with court rules,[15] or any specific reference to the precise evidence alleged to be irrelevant, rehash the alleged insufficiency of the evidence. The cases upon which appellants rely rest on *specific* errors made by trial courts in the introduction of *specific evidence*.[16] No such attack is here made, and we find no error.

The judgments of conviction are each affirmed.

11. Brief, p. 8.

12. We assume jurisdiction exists for meeting this issue in this court, despite the question whether a proper appeal was taken on this issue.

13. Save as to character evidence, both relating to the defendants, and the witnesses Connell and Jarman.

14. Pitts v. United States, 9 Cir., 1959, 263 F.2d 808, cert. denied, 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535; Gallegos v. United States, 9 Cir., 1961, 295 F.2d 879.

15. The second sentence of Rule 18(d) of the Rules of this Court reads as follows: "When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the printed or typewritten transcript where the same may be found."

16. The *specific* evidence alleged to have been erroneously admitted or excluded was:

(a) "Ex. 55" in Olender v. United States, 9 Cir., 1954, 210 F.2d 795 at 808;

(b) "The amount, percentage-wise, received by creditors from the bankrupt estate" in Edwards v. United States, 9 Cir., 1959, 265 F.2d 302, 307;

(c) The exclusion in Wolcher v. United States, 9 Cir., 1952, 200 F.2d 493, of certain "correspondence" between Wolcher and a New Jersey company (p. 499); and the introduction of (1) a 1948 statement describing a 1943 conversation (p. 496); and (2) a working copy of a partnership tax return never filed, and not related to defendants' taxes then involved (p. 497).